CHARLES KADLOWSKI, Administrator of Estate of OTTO KADLOWSKI, and CHARLES KADLOWSKI, Appellants, v. JOSEPHINE SCHWAN.— 44 S. W. (2d) 639.

Division One, December 21, 1931.

*Jos. T. Davis* and *M. G. Baron* for appellants.

448

*Bass & Bass* and *J. A. Razovsky* for respondent.

GANTT, P. J.—Action to cancel a warranty deed executed by Otto Kadlowski, deceased, on August 11, 1924. It purported to convey to defendant, Josephine Schwan, an apartment house located at 4156 and 4158 Lucky Street, St. Louis, Missouri.

Plaintiff seeks cancellation on the grounds of mental incapacity, inadequate consideration, undue influence and fraud. He also seeks an accounting of money collected for rent and property alleged to be assets of the estate of deceased and appropriated by defendant.

After making certain admissions not material, defendant answered by general denial, with a plea of payment of an adequate consideration for the real estate.

Further answering and by way of a ''contingent counterclaim,'' defendant pleaded that if the deed is cancelled, the court should determine the amount of the indebtedness of Otto Kadlowski to her and decree same a lien on said real estate with an order of sale, or allow same as a demand against the estate of Otto Kadlowski and order its ''judgment of lien'' certified to the probate court for further proceedings as provided by law.

Further answering and by way of a ''cross action for money paid for permanent improvements,'' defendant pleaded that if the deed is cancelled, the court should determine the amount paid by her ''in good faith'' for improvements on said real estate and decree same a lien thereon and with an order of sale if plaintiff failed to pay same with interest within a time fixed by the court.

The reply was a general denial. The court found in favor of defendant and dismissed the petition. Plaintiff appealed.

The facts may be outlined as follows: Otto Kadlowski owned an apartment building at 4156 and 4158 Lucky Street in St. Louis, Missouri. He resided there and rented apartments, receiving an estimated rental of $56 per month. And for many years he had an income from his business of selling and delivering mineral waters. His wife died in 1915. On August 11, 1924, he signed a warranty deed purporting to convey this real estate to defendant. He died on November 6, 1924. Plaintiff, Charles Kadlowski, and Otto Kadlowski, Jr., are sons and only heirs at law of deceased. Plaintiff and his family occupied one of the apartments for several years prior to 1911. He then moved to another part of the city. Otto Kadlowski, Jr., was single and lived with his father and mother. Plaintiff and family visited at the home until the death of the mother. On her death the father employed a housekeeper. Plaintiff disapproved of this and discontinued his visits to the home. Thereafter Otto Kadlowski, Jr., quarreled with his father and moved to plaintiff's home. Otto was unfriendly with his father to the end. In the early part of 1923 the father attended the funeral of plaintiff's daughter and

resumed friendly relations with plaintiff, which continued until his death.

Defendant was not related to Otto Kadlowski, nor to any member of his family. In 1915 they became acquainted as members of a German society. As such they continued in contact with each other, and on invitation of Mr. Kadlowski's housekeeper defendant made occasional visits at his home. After the death of the housekeeper in 1923 defendant came in contact with Mr. Kadlowski frequently. She cleaned his living rooms every two weeks, and they were together on other occasions. Although Mr. Kadlowski suffered from pains in his feet, he continued to deliver mineral waters until about July 18, 1924. On that day he went to the office of Dr. Schuck for treatment. On examination, the doctor found that he had "diabetes mellitus and gangrene." His condition was such that the doctor sent him to Josephine Hospital, where plaintiff and defendant visited him daily. On the night of August 7, 1924, defendant approached plaintiff in the hospital and said: "We have to do something for your father; his condition is awfully bad. We will have to do something, and I have his room fixed up so nice at home and he wants to go home the worst kind; that she had a doctor coming in from the country who was an expert on diabetes and she would attend to his treatment and she would stay there to see that he was properly attended to, and she had his room fixed up so nice." This suggestion caused plaintiff to call on Dr. Schuck for information as to the condition of his father. The doctor advised that his father should remain at the hospital. On returning to the hospital and in the presence of defendant, he asked his father if he wanted to go home. The father did not answer. Believing defendant, and that it was his father's last wish, plaintiff arranged for his removal. On the next day (August 8th) the father was removed to his home. On that day plaintiff visited his father at three P. M., and found defendant and her sister-in-law, Mrs. Retz, "trying to get him to lie down in bed." The doctor (Dr. Youngman) mentioned by defendant, was there, but not in the father's room. Plaintiff inquired as to his father's condition, and defendant answered "pretty well." He also inquired of his father, who "kind of mumbled 'all right.'" Plaintiff then left and did not return until the next day. On examination, Dr. Youngman found Mr. Kadlowski in a serious condition and informed defendant that there "was no hopes for him." He directed her to have him moved to a hospital and left, giving no further attention to the case. Defendant remained until nine P. M. Mr. Keeney, a tenant, testified that during this time she continuously urged Mr. Kadlowski "to make his will." He answered "there is time enough yet." She testified that he told her to employ an attorney.

Mr. Keeney cared for him until ten P. M., and retired for the night. However, he was awakened each hour by an alarm clock and went to Mr. Kadlowski's room to give him attention. The next morning (August 9th) defendant called at the office of Mr. Loevy, an attorney, and employed him to write Mr. Kadlowski's will. On that morning defendant, Mr. Loevy and his business associate Mrs. Weber, went to the home of Mr. Kadlowski for that purpose. Mr. Loevy testified to occurrences thereafter as follows: "I asked him what his property was, and deceased told me that he owned the house he was living in on Lucky Street, and thought he owned the furniture in the room he was occupying, a gasoline truck and some other items of personal property; I made a memorandum of them; I asked deceased to whom he wanted to will his property, and whether he had a family; deceased said his wife had died some years ago, and that he had two sons; one of them had not called on him or spoken to him for a number of years, and the other—Charles—had not done anything for him; he had not seen or spoken to him within the last year. I asked deceased what he wanted to leave him and he said he did not want to leave him anything; he wanted his property to go to Mrs. Schwan, who had befriended him and took care of him and advanced him money for his living expenses. I then asked deceased for the deed to the property and looked them over; I looked over the other papers; when I asked deceased for the deed, he told defendant to get it. Deceased did not leave his cot or bed while I was there; defendant got the deed, together with some cancelled deeds of trusts and cancelled notes and a few other miscellaneous papers and handed them to me. There was no calculation made by me at any time as to how the amount of $2,000 was arrived at. Deceased said he owed her more money than he could pay her. I was told that certain moneys had been spent and was shown certain receipts. I did not estimate or count up how much those receipts aggregated and made no calculation in Mr. Kadlowski's presence." Defendant gave all the records and papers belonging to Mr. Kadlowski to Mr. Loevy, who on leaving took them with him. These receipts are not in evidence. Defendant testified in her deposition that she did not know why Mr. Loevy was at the home of Mr. Kadlowski and did not know he was writing a will for him. On the contrary Mrs. Weber, witness for defendant, testified that she talked to Mr. Kadlowski while Mr. Loevy and defendant "were busy fixing up the will." Mr. Loevy testified that he "wrote out the will in pen and ink in the room and read it to him." The will was witnessed by Mrs. Weber and Mr. Tedder, a tenant of Mr. Kadlowski. Mr. Loevy gave it to defendant, who paid him for his services. The will is not in evidence. Defendant testified that she gave it to her attorney, Mr. Razovsky. However, it may be inferred that the will bequeathed and devised all of

Mr. Kadlowski's property to defendant. At three P. M., that day defendant caused Mr. Kadlowski to be moved to Barnes Hospital. On returning to his father's home at seven P. M., that day (August 9th) plaintiff learned from a tenant that his father was in Barnes Hospital. He could not visit him that evening, but did so the next day. On Sunday afternoon, August 10th, a woman called Mr. Loevy on the telephone and told him that Mr. Kadlowski wanted a deed written and not a will. She gave "the details of the deed over the telephone." At the trial defendant testified that she did not call Mr. Loevy about the deed. In her deposition she testified that Mr. Kadlowski told her to call him, but did not state for what purpose. On Monday morning August 11th, defendant went to Mr. Loevy's office and he prepared a deed conveying the real estate to defendant, reserving to Mr. Kadlowski the use of the rear rooms of the house free of rent during his life time. The consideration named in the deed was $2,000, "now due by him to her and further loans to be made by her to him, the receipt of which is hereby acknowledged." After the preparation of the deed, the defendant, Mr. Loevy and Mrs. Weber went to Barnes Hospital, arriving at nine-thirty A. M. Mr. Loevy testified to occurrences thereafter as follows: "Deceased asked me to read the deed, which I did and he said it was all right; he asked me about the difference between a will and a deed and I explained to him, that the will would not take effect until his death, whereas the deed would as soon as it was delivered to the grantee in the deed; deceased said nothing. He signed the deed in my presence and I took his acknowledgment. The deed was also signed by Mrs. Weber as a witness. I gave the deed to the defendant in the presence of Mr. Kadlowski to be recorded." On that evening Mr. Kadlowski's right leg was amputated. Mrs. Weber testified that "all that Mr. Loevy did that morning out there (Monday morning) was merely to read this deed to him and then after he read, Mr. Kadlowski said 'that is all right.' " On the contrary defendant testified that she "negotiated for the sale and purchase of the property at Barnes Hospital while Mr. Kadlowski was lying sick in bed; that Mr. Loevy and Mrs. Weber were present; that Mr. Loevy asked Mr. Kadlowski how much he owed me, and he answered about $2,000; I want to sell her the house for that money." After the deed was delivered, defendant caused Mr. Kadlowski to be removed to a "pauper ward." She told the hospital authorities that he had nothing. Mr. Keeney testified that he delivered to Mr. Kadlowski about $40 rent money while he was in the "pauper ward;" that defendant told him he should not have done so for the reason the nurse asked her (defendant) where that money was coming from.

Plaintiff knew nothing of the execution of the will or deed. He went to his father's home after his death and found no property,

records or papers. Everything had been taken from the home. Thereafter defendant told him that his father left a will and gave to him his watch and chain, and that if he would come to her house she would give them to him. Plaintiff several times asked her when she would record the will. She answered "sometimes when she goes down town." He called at her home and she gave him the watch and chain. She did not mention the deed or that she had bought the property. Sometime thereafter defendant visited at plaintiff's home. At that time he asked her "when she was going to record the will." She answered: "The watch is willed to you, but I bought the property."

On the death of Mr. Kadlowski defendant took possession of the real estate and personal property. She sold some of the personal property and the balance was moved to her home. Other facts will be stated in the course of the opinion.

Plaintiff seeks to discover assets of the estate in this proceeding. This cannot be done. He must proceed under Sections 63 to 67, Revised Statutes 1929. [State ex rel. v. Lamm, 216 S. W. 332; Clinton v. Clinton, 223 Mo. 371, 123 S. W. 1.] This may be put aside.

Defendant pleads for an accounting of indebtedness and a judgment lien on the real estate with an order of sale. There is no evidence to sustain the plea. Defendant does not claim that the indebtedness was in any way connected with the real estate. It was an unsecured indebtedness. The plea is not germane to the original bill and must be denied. [Fulton v. Fisher, 239 Mo. 116, l. c. 130, 143 S. W. 438.] This also may be put aside.

Defendant alleged in her answer that the only consideration for the deed was the payment of a debt. This reduces the conveyance of the real estate to a business transaction. They dealt at arms' length. Therefore, the state of Mr. Kadlowski's feelings toward defendant and his sons cannot be considered on the issue of consideration.

. We next consider the reservation of the rear rooms during the life of Mr. Kadlowski and the agreement to make "future loans." It is clear that defendant knew the physical condition of Mr. Kadlowski at the time he signed the will and deed. She knew "there was no hopes for him." Dr. Youngman so informed her. She knew that he would not again occupy the rooms and knew that she would not be called upon for "future loans." She had receipts showing the payment of small bills of deceased while he was in the hospitals and shortly after his death. And at his request and while he was in Barnes Hospital she paid a note at the bank for $150, and after his death paid a debt of deceased amounting to $50. She

admitted receiving rent money while he was in the hospitals, but testified that said money, the sick benefit of five dollars per week from a lodge, and the burial benefit of $150 from another lodge were not sufficient to pay the debts, and that she paid the balance with her money. She made no showing of the amount of her money so used. It may have been five cents or five dollars. Clearly, the reservation of the rooms and agreement to make "future loans" are make-weight, and also may be put aside.

We now consider the evidence on the question of consideration. Defendant testified that deceased owed her "as much or more than $2,000." Mr. Loevy testified that deceased stated to him he owed defendant more than he could pay. Defendant lived in a rented house. The family consisted of her husband, daughter, crippled son, brother-in-law and children of a deceased daughter. She testified that she received $40 per month for the support of the children; that her husband gave her his net weekly earnings from his barber business, amounting to about $20 per week; that the other members of the family, except the crippled son, paid board; that from this she accumulated money from which she made loans to deceased; that she kept most of the money at her home; that she kept no record of loans made to him; that he sometimes gave her notes and that she had many of them; that she did not know how much he owed her and that she made the loans without security; that she did not inquire and did not know for what purpose he wanted the money and that he had not paid to her any loan or interest thereon. She further testified that she first loaned money to him in 1917 and thereafter made loans to him at different times in sums of $300, $500, $175 and $250 in cash. At the trial she produced only two notes, one for $350, dated September 20, 1922, and one for $500, dated February 1, 1924. The $500 note was torn. In explanation of this she testified that she wanted to destroy it; that deceased "said I should not do that," and "I thought maybe I would need it."

On the other hand the evidence tends to show that deceased was not in need of defendant's money. He had credit at the bank and borrowed small sums. He lived alone in the rooms, prepared his meals and had no expense except for clothing. Moreover, he had an income of $56 per month from rents, and $50 per month from his mineral water business. A few days before he was taken to the hospital, plaintiff found him in his rooms counting money—$20, $10, $5 and $1 bills. He had been saving to buy a new truck, but on account of his physical condition was afraid that the money would be paid to doctors and hospitals. There was in his room at Josephine Hospital a satchel in which he had money. Even so, defendant

testified that he told her he had no money, and that the second week he was in the hospital she gave him $85.

Defendant assumed the burden of proving adequacy of consideration. Her testimony on the question is not convincing. The two notes are the only evidence tending to show consideration, and their validity is questioned by the facts and circumstances in evidence. But assuming their validity, the evidence tends to show that the real estate was of the value of $4500. The notes were obligations to pay $350 and $500. On this question Mr. Loevy, defendant's attorney, testified that deceased at the time the will was written, stated that "he owed her more money than he could pay her." If he made this statement, he was not in condition to know the value of his property, for defendant claimed only an indebtedness of about $2,000, which was less than half the value of his real estate. It follows that the defendant did not pay an adequate consideration for the real estate.

We next consider the mental condition of deceased at the time he signed the deed. Defendant, Mr. Loevy and Mrs. Weber testified that he was sane and rational at the time he signed the will and deed. Mr. Tedder testified that he was in the room only a few minutes, witnessed the will, and that he did not know deceased's mental condition. Mr. Keeney testified that he visited deceased twice a week at Josephine Hospital; that at first his physical and mental condition was "pretty good;" that on the second visit he gave him $36 rent money, which deceased directed him to put in a satchel, in which he had other money; that thereafter he grew gradually worse; that he visited him three days before he was removed to his home; that deceased did not know him; that he was very feverish and when he spoke to him that "he just kind of flared his eyes open and dropped back to sleep;" that he made no answer; that he was unable to hold a conversation; that he saw him at his home the evening of August 8th, the day he was moved from the hospital; that he cared for him during that night; that he was feverish and restless all night; that he was unable to hold a conversation and that he was uneasy about him.

Otto S. Hirsch, a friend of deceased, testified that he visited him four times a week while he was in Josephine Hospital; that he found him suffering severe pains and his condition grew worse from day to day; that he found him delirious on the day he was moved to his home; that deceased did not know him and called him "Fritz;" that he said: "Why don't you bring an undertaker;" that he also visited him in Barnes Hospital about a week after his leg had been removed and deceased seemed in better mental condition.

Henry Puls, also a friend of deceased, testified that he visited him three times at Josephine Hospital; that the first visit was a week

after he went to the hospital; that at that time he held a lengthy conversation with him and discussed the lodge and other matters; that on the second visit he was not in good condition; that he would converse for a while and then doze off to sleep; that on the third visit, which was the day before he was moved to his home, he was in very bad condition; that he said: "Everything is gone; both legs is taken off and my satchel is gone, and my leg is gone;" that he handed him his satchel, which he opened, and there was money and checks in it; that he was unable to hold a conversation.

Dr. Wolfert, resident physician at Josephine Hospital, testified that he treated deceased while he was in the hospital and saw him every day; that his condition was toxic and he was poisoned by the absorption of sugar; that his mental condition was abnormal; that on the day he was moved to his home he was delirious; that gangrene had progressed so far that it affected his toes and his legs; that there was interference with the circulation of blood; that some of his toes dropped off and he was suffering great pain; that on the day he left the hospital he was not mentally capable of transacting business; that during the time he was at the hospital his fever ranged from one hundred to one hundred and three and one-half, with an increased pulse rate; that the disease was in form progressive and his mind was abnormal the whole time he was in the hospital; that if the nurse offered him a drink of water he would say, "Yes;" that he would take his broth at the direction of the nurse and "things of that kind;" that he had lucid moments enough to do as he was told; that he could not have been in a better condition while in Barnes Hospital; that the facts prove the contrary; that the amputation of his leg on August 11th is conclusive proof that the disease had continued to progress and by that time he was poisoned by toxic poison to such an extent that it was necessary to remove the leg; that in his opinion the deceased was not mentally capable of transacting business on August 11, 1924.

Dr. Schuck testified that he treated deceased until he left Josephine Hospital; that on examination at his office he found him suffering from diabetes and gangrene of the feet and sent him to the hospital; that he did not improve; and the gangrene gradually spread and it became necessary to remove a big toe; that his condition continued to grow worse during the entire time he was at the hospital; that he was running a temperature at all times; that toes of his left foot rotted off and the decay spread to his right foot and leg; that during the first two or three days his mental condition was fair; that afterwards it became rather muddled; that at times his mental condition seemed to be rather lucid; that he could be aroused and would make some intelligent answers and then lapse into a bad mental condition; that when he left the hospital his mental condition was

very bad; that he was not capable of transacting any business during the last day or two he was in the hospital; that he did not treat him after he left Josephine Hospital but the disease was progressive in form, and if it was necessary to amputate his right leg on August 11, 1924, in his opinion he was not mentally capable of transacting business on said day.

The record of Barnes Hospital on the general condition of deceased on arrival was made by an interne, a part of which follows:

"Well developed and nourished male, 67 years of age, lying in bed, without any momentary discomfort. Sensorium clear. Patient pleasant, hazy and cooperative. Speech clear and coherent. Well oriented. Skin warm, moist and elastic."

Dr. Cole, physician at Barnes Hospital, testified that the day preceding the operation he was fairly clear mentally; that during the night his condition became suddenly worse and the next morning (August 11) we decided to wait a few hours for improvement; that his condition continued to grow worse, and his temperature had risen; that at times he had delusions and was incoherent in his speech and at times he would answer coherently; that he was not clear mentally; that he continued to grow worse and he removed his leg that evening; that he did not think deceased was mentally capable on August 11th of transacting the business of determining the amount of an indebtedness and conveying all his real estate in payment thereof.

Dr. Youngman and Mrs. Retz were not called by defendant and did not testify in the case.

We think the evidence conclusively shows that deceased was not mentally capable of protecting his interests at the time he signed  the deed. Moreover, the evidence shows that defendant had in mind the property of deceased when she caused his removal to the home. The surroundings at the hospital did not favor the execution of her plans. On the arrival of defendant at the home, she continuously urged him to make a will. He did not want to refuse her and sought relief in delay. Defendant knew his condition. She took charge of the matter, employed an attorney, who appeared at the home and they prepared the will. Later she decided in favor of a deed, had one prepared, appeared at the hospital with her attorney and witness, and deceased signed it. Afterwards she caused him to be moved to a "pauper ward." These facts, considered with other facts and circumstances in evidence, make a clear case of coercion, undue influence and fraud on the part of defendant. She is not in position to seek relief for improvements. [Kisling v. Yoder, 236 S. W. 860, l. c. 867.]

The judgment is reversed and the cause remanded, with directions to cancel the deed, dismiss defendant's "contingent counterclaim for an accounting" and "cross action for money paid for improvements," and take an accounting of the rents due plaintiff from the real estate. All concur.