ELLA D. PLUMMER v. JOSEPH RANDOLPH LASSON and GRACE LASSON, Appellants.—No. 38309.—177 S. W. (2d) 455.

Division One, January 3, 1944.

Rehearing Denied, February 7, 1944.

*R. C. Southall* for appellants.

*David R. Derge* and *Robt. M. Murray* for respondent.

318

GANTT, J.—Action to set aside a warranty deed executed by the plaintiff which conveyed to the defendants, husband and wife, the title to the west forty feet of Lot 402 in Marlborough Heights, an addition to Kansas City, Mo. The consideration stated in the deed is "one dollar and other good and valuable considerations". The chancellor set aside the deed. Judgment accordingly and defendants appealed.

In substance the petition alleged that the deed was without consideration and that by misrepresentation and fraud the defendants induced the plaintiff to execute the deed.

In substance the joint answer of the defendants alleged that plaintiff deeded the property to the defendants in payment of legal services rendered to plaintiff by defendant Joseph R. Lasson, an attorney of Kansas City, Mo., and in consideration of his promise to continue rendering legal services to plaintiff during her life time, and in consideration of a continuation of the services being rendered to plaintiff by the defendant Grace Lasson. The reply denied the allegations of the answer. Plaintiff will be referred to as Ella. Defendants will be referred to as Joseph and Grace.

Ella and husband were in business in St. Louis for thirty-eight years. They sold building material and constructed fronts on store buildings. She was interested in the business and it was her part of the work to "figure the balances and take off the discounts". She made loans on real estate both in St. Louis and Kansas City.

On being divorced, she moved to Kansas City. At the time of the trial she was sixty-nine years of age, had resided in Kansas City five years, and had only a limited income. She became acquainted with Joseph and Grace in 1940. At that time she resided at 2420 Linwood and had two women roomers. Seemingly Ella, Joseph and Grace became close friends. Grace owned an automobile. On her invitation, Ella frequently made trips with her about the city and surrounding counties. On these trips Ella attended to shopping and other personal matters. In the course of the association Ella stated

that she would like to purchase a lot on which both could build a home and reside as neighbors. In view of the suggestion, Grace, who was in the real estate business, from time to time exhibited to Ella lots in different parts of the city. Ella was not satisfied with the lots. In this situation Grace suggested that she purchase the property on which Joseph and Grace resided at 1485 E. 77th Street, known as Lot 402 Marlborough Heights. The lot is one hundred feet in width and the residence is located on the west forty feet of the lot. They paid $20.00 a month rent. Ella thought favorably of the suggestion and stated she would pay $2500.00 for the property. Grace arranged for a sale of the property to Ella. She requested Ella to permit Joseph to attend to the matter. Ella signed a check for $2500.00 payable to Joseph which she delivered to him to pay for the property. He drew the contract for the sale and purchase of the property. There were many liens against the property which was owned by the Findlay-Marlborough Realty Co. On satisfaction of the liens, the Kansas City Title Insurance Co. guaranteed the title. Joseph paid ▮ the owner and received a warranty deed, which was recorded on February 14, 1941. On receiving the deed, Ella expended $300.00 in repairing the house in which Joseph and Grace resided.

In the meantime Ella decided to purchase the vacant lot at 1483 E. 77th Street, known as Lot 403 Marlborough Heights. It adjoined the lot on which Joseph and Grace resided. At Grace's request Ella also permitted Joseph to attend to this matter. Lot 403 was owned by a woman residing in Illinois, who offered to sell the same for $400.00, if Ella would pay the taxes, including a sewer tax. Later she offered the lot for $350.00 if Ella would pay the taxes, including a sewer tax. Ella accepted the offer, received a deed for the lot and paid all the taxes. She built a house on the lot and moved to same April 1, 1941. On May 10, 1941, she manifested her friendship by deeding to Grace as a gift the east sixty feet of Lot 402, of the value of $500.00, on which to build a house and reside next to Ella. In June, 1941, Grace stated to Ella that they liked the home in which they resided and also stated that the house needed some repairs. She inquired what Ella would take for the property. Ella stated $2300.00. Grace stated they had a lot of money invested in an invention of Joseph's from which they had an income. There was nothing more said about the matter until in September. At that time Grace stated they would likely be able to buy the property and again inquired of Ella how much she would take for the property. Ella stated $1900.00 in its present condition. Grace stated that was reasonable. She further stated that they would make a cash payment of $1000.00 in two or three weeks and the balance in monthly payments of $23.00. She also stated to Ella that installment payments would be better for her than payment in full. Ella agreed to the terms. On Oct. 2, 1941, Grace stated to Ella that she should see Joseph about

the matter. Acting on the suggestion, Ella went with Grace on the morning of Oct. 3, 1941, to Joseph's law office. In substance Ella stated the occurrences in the office as follows:

On entering the office, Joseph inquired of Grace and Ella if they had reached an agreement. Ella stated they had agreed on $1900.00 for the property, $1000.00 to be paid in two or three weeks, and the balance in monthly payments of $23.00. Joseph stated that $20.00 a month was all they could pay. Ella agreed to a payment of $20.00 monthly. Joseph had prepared a document and stated that it was a regular real estate contract. He placed it on the desk in front of Ella with the top "tipped back" so that the words "Missouri Warranty Deed" at the top of the paper could not be seen. He then directed Ella where to sign her name. She did so and at the time noticed a description of the lot. She did not read the document. On Ella signing her name, Joseph took the document to a notary across the hall, who came to the office door and inquired of Ella if this was her free act. Joseph never gave her a paper writing nor a copy of the document. He kept the document. On execution of the document, Grace and Ella left the office.

On a friend advising her that she should have a copy of the contract, Ella, within four days after signing the document, called Joseph and demanded a copy of the contract and also stated to Grace that she wanted some money and a copy of the contract. Joseph said he would furnish her with a copy of the contract. She also asked him for some money. Joseph said he would send her some money in a few days. Ella had further conversations with Joseph and Grace demanding a copy of the contract and money. She called him every few days about the matter. He stated that he would receive a check and would give it to her. Ella also made demands on Grace for a copy of the contract and for some money. Grace stated that she had a $50.00 bond which she would cash and give the money to her. The next day she told her she had lost the bond. Ella made many demands for a copy of the contract and at the same time demanded money because Joseph and Grace had told her they would make regular payments. In January, 1942, Grace showed Ella a paper purporting to be a copy of the document Ella signed on Oct. 3, 1941, in Joseph's office. The paper was a contract for a deed or a real estate contract. It contained a one hundred eighty day clause. Ella asked Grace what that was for. Grace stated they had one hundred eighty days to pay for the property, and if she and Joseph did not pay within that time they would return the property to Ella. Ella refused to accept the paper as a copy of the contract she thought she had signed. After reading same, she returned it to Grace. At that time she told Grace she thought they were deceiving her. Ella stated that she called ▮▮▮ Joseph on Jan. 14, 1942, and asked him what he meant by sending a paper to her containing a one hundred eighty day clause. Joseph

stated they had to put some number of days in the contract. Ella stated she never received a bill or bills for legal services from Joseph prior to Jan. 14, 1942. After this date and on or about Feb. 5, 1942, she received a bill from Joseph charging her $250.00 for his services in connection with the purchase of Lot 403, and charging her $500.00 for his services in connection with the purchase of Lot 402.

In substance, Joseph testified with reference to the negotiations for the property, the occurrences in the office, and attorney's fees as follows:

He complained to Ella about the house needing repairs. Ella suggested that he buy the property. She offered to sell same for $2500.00, later $2300.00 and finally $1900.00. Joseph turned down each offer. He insisted that Ella pay his attorney's fees, and stated that unless the repairs were made he would move from the property. Ella stated that she could not afford to spend the money. Joseph stated to Ella that if she would deed the property to him he would call the bill for attorney's fees settled and would agree to render legal services to Ella as long as she lived. Ella accepted the offer and directed Joseph to prepare the deed. She stated that she would come to his office the next day and sign the deed.

On the occurrences in the office, Joseph testified that Ella sat opposite to him at the desk, and Grace sat at the end or corner of the desk. He handed Ella the deed and stated it was a warranty deed for the house and further stated if she did not understand it he would explain. Ella stated she was familiar with it. Joseph left the deed on the desk in front of Ella while he stepped across the hall to get a notary, who came to his office. The notary noticed that the words "a single and unmarried woman" did not follow Ella's name on the face of the deed. She called Ella's attention to the omission. The notary then took the deed to her office and inserted those words. She returned with the deed and Ella signed it. On Ella raising her right hand, the notary inquired if she acknowledged this as her free act. Ella answered that she did. The notary then took the deed and went to her office where she completed the execution of the deed. Joseph denied that at the time Ella signed the deed, the top part of the document was "tipped back". On the execution of the deed Joseph delivered to Ella a receipt acknowledging full payment for legal services. Joseph stated that he heard no complaint from Ella about the transaction until in January, 1942. At that time she called him on the telephone and stated that she should have received more money for the property. Joseph answered that he would hold her to the deal and refused to convey the property to her.

In support of his claim that Ella was indebted to him in the sum of $1250.00 for legal services, Joseph offered in evidence copies of statements for legal services which he claimed to have mailed to Ella

on the dates shown on the copies and at the addresses shown on the copies. The statements follow:

"1. Exhibit A-5, dated December 15, 1940, addressed to respondent at 1483 East 77th Street, covering legal services from September, 1940, to December, 1940, in the sum of $200.

"2. Exhibit A-6, dated May 15th, 1941, addressed to respondent at 1483 East 77th Street, covering legal services from December 20th, 1940, to May, 1941, in the sum of $750.

"3. Exhibit A-7, dated October 1st, 1941, addressed to respondent at 1483 East 77th Street, covering legal services from May 16, 1941, to October 1st, 1941, in the sum of $300."

It will be noted that Exhibit A-5 is dated Dec. 15, 1940, and addressed to Ella at 1483 E. 77th St. At that time Ella had not purchased Lot 403 at 1483 E. 77th St. She was residing at 2420 Linwood. The letter containing said statement was not returned to him by the postal authorities. On cross examination he could not explain this occurrence. His attention was called to the fact that said copies, which he testified were exact copies of the originals made Dec. 15, 1940, May 15, 1941, and Oct. 1, 1941, all bore the identical dark wavy marks of the carbon paper in the same place on each exhibit, indicating that the copies were not made on the different dates above mentioned but on the same date. He also was unable to explain this occurrence. On being asked to do so, he answered: "Don't ask me." After an adjournment over night, Joseph, on being recalled as a witness, stated that Ella told him she had never received any statements from him for legal services and asked him to send her statements. She made this request after she moved to 1483 E. 77th St. He stated that the copy in his file dated Dec. 15, 1940, showed that he had mailed that statement to her at 2420 Linwood. He further stated that in sending the additional statements to Ella he mailed them to 1483 E. 77th St. where she then resided. On further cross examination he testified as follows:

"Q. You say you made this copy exhibit A-5 from the original? A. Yes.

"Q. Where is the original, Mr. Lasson? A. The original copies were so blurred, and I didn't send them and I have the blurred invoices in my office.

"Q. The originals were never sent to Mrs. Plummer? A. I mean the copies of the originals. I never mailed the copies and I have the copies of the originals.

"Q. You say these were made out in June or July of 1941? A. It was during the negotiations for the purchase of the west 40 feet of lot 402.

"Q. When do you say that was copied? A. The negotiations were pending—

"Q. (Interrupting) Just give me the time, please. A. To my best memory it would be around about June, July or August, I cannot state definitely.

"Q. Now, not later than August, these statements were sent, then, is that right? A. I wouldn't be certain about that, I might be mistaken. You understand I am not testifying from notes.

"Q. Now take exhibit A-7, how could you send the statement dated October 1st, 1941, in August, 1941? A. This one here—

"Q. That is dated October 1st, 1941? A. I am mistaken about this one here. That was mailed on the date it specified."

Exhibit A-5 for $200.00 did not state the services rendered. Exhibit A-6 for $750.00 was Joseph's charge for legal services in representing Ella as the buyer of Lots 402 and 403. Exhibit A-7 for $300.00 enumerated his fees for answering telephone calls from Ella, and enumerated other miscellaneous services. Although claiming for legal services between May 15, 1941, and Oct. 1, 1941, Joseph testified that Ella had not requested legal services for some time prior to Oct. 3, 1941, and that he had delivered her papers to her in June, 1941, and was not representing her in any matter on Oct. 3, 1941. He further stated that although Ella owed him for legal services for which he frequently demanded payment, he continued to pay her the $20.00 a month rent from Feb. 15, 1941, until Oct. 15, 1941.

In substance Grace testified with reference to the negotiations for the property and the occurrences in the law office as follows:

She and Ella went to the office, sat down and Joseph handed Ella the deed, stating to her that if there was anything she did not understand, he would explain it to her. Ella held the deed in a natural way. Grace thought Ella laid it on the desk. Joseph left the room to get the notary. During that time the deed was on the desk in front of Ella. Joseph said to her: "Ella, here is a warranty deed". Grace stated that she heard the notary say something about the deed and that she believed the notary pointed out to Ella where certain words should be in the deed. She saw Ella sign the deed without complaint. She did not read the receipt given by Joseph to Ella, but saw Joseph hand the receipt to her. She stated that it was quite a long time before Ella complained about the transaction. She thought Ella made some complaint to her between October and January about not being satisfied. It was a little before January. Ella kept talking about property going up. She did not think Ella ever stated to her that they had defrauded her. She thought she did make some such a charge. She was not quite clear about it. She did not exactly ask that they deed the property back to her. Ella kept talking about not having any income and not having any money. She stated that they had promised if she needed money they would let her have it. Ella was over at her house when Joseph was making repairs. She made no

comment about it. Both Joseph and Grace testified that Ella was a nuisance.

Grace did not deny Ella's statement with reference to the negotiations she and Ella had about the sale and purchase of the property for $1900.00, $1000.00 cash and $23.00 a month, subject to the approval of Joseph.

Furthermore, Grace did not deny that she told Ella that Joseph was interested in an invention which would furnish the money to make the $1000.00 payment on the property.

Furthermore, Grace did not deny that she requested Ella to permit Joseph to attend to the purchase of Lots 402 and 403.

Furthermore, neither Joseph nor Grace denied the testimony of Ella that they tendered to her a purported copy of the document she signed which contained the one hundred eighty day clause. They did not deny her testimony with reference to her conversations with them in January, 1942, about the purported copy.

In substance the notary public testified as follows:

Joseph's office was across the hall from her office. On Oct. 3, 1941, he came to her office about four-thirty in the afternoon and asked if she would wait to take an acknowledgment for him after five o'clock. She consented, and about that time went to his office and took an acknowledgment to the deed exhibited to her. The deed was on Joseph's desk. It was lying by the side of Ella flat on top of the desk. Ella was sitting at the corner of the desk and the deed was at her elbow. Joseph did not have the deed in his hand. The deed was not turned down at the top at any time she was in the office. She showed Ella where to sign, and that is her signature. She turned it over and saw the acknowledgment was filled out for a single woman. She called Joseph's attention to that fact. She suggested to him that in order to keep the title clear, he should state that she was single on the face of the deed. In making the suggestion she indicated to Ella what she was talking about. Ella looked at the deed. She then went to her office and inserted the words on the face of the deed. On returning to the law office, Ella signed the document and she took her acknowledgment by having her hold up her hand and swear that it was her free act.

In answering a hypothetical question, five lawyers valued Joseph's legal services to Ella at from $1000.00 to $2000.00.

We now consider the claim of Joseph for fees. He testified that on Dec. 15, 1940, he mailed to Ella at 1483 E. 77th St. a $200.00 statement for legal services from September, 1940, to December, 1940. It was not itemized. Joseph had been a lawyer for eighteen years and never kept a book account of services rendered to clients. He introduced in evidence as Exhibit A-5 a purported copy of the statement. From the record we assume that it covered telephone calls from Ella and other miscellaneous minor inquiries from her. She denied re-

ceiving the statement. On Dec. 15, 1940, she resided at 2420 Linwood and not at 1483 E. 77th St. The statement was not returned to him by the postal authorities.

He also testified that on May 15, 1941, he mailed to Ella at 1483 E. 77th St. a $750.00 statement for legal services from Dec. 20, 1940, to May, 1941. He introduced in evidence as Exhbit A-6 a purported copy of the statement. It covered his charge for services in connection with the purchase of Lots 402 and 403. He charged $500.00 for services in connection with the purchase of Lot 402. Joseph and Grace resided on the west forty feet of this lot. On May 10, 1941, Ella gave the east sixty feet of this lot to Grace. As stated, there were many liens against the property. The $500.00 charge was almost wholly for services in connection with the cancellation of the liens. Of course, the burden was on the Findlay-Marlborough Co., the owner of the lot, to cancel the liens. Any services rendered by Joseph in that behalf were services to the owner and not to Ella. There was no abstract of title to examine, for Ella accepted a guarantee of title from the Kansas City Title Insurance Co. in lieu of an abstract. The expense of the preparation of the deed to Ella also was on the owner. Thus it appears that the $500.00 is a charge against Ella for only mythical services.

The $250.00 balance of the $750.00 is for legal services in connection with the purchase of the vacant Lot 403. The owner asked $400.00 for the lot, the purchaser to pay the taxes, including a sewer tax. As a result of the correspondence between Joseph and the owner, she agreed to accept $350.00 for the lot, the purchaser to pay the taxes, including the sewer tax. Joseph prepared the contract of sale and purchase, examined the abstract, and prepared the deed. Thus it appears that he charged Ella $250.00 for services in purchasing a vacant lot for $350.00. She also denied receiving this statement for legal services.

He also testified that on Oct. 1, 1941, he mailed to Ella at 1483 E. 77th St. a $300.00 statement for legal services from May 16, 1941, to Oct. 1, 1941. He also introduced in evidence as Exhibit A-7 a purported copy of the statement. It also is a charge for answering telephone calls from Ella and for other miscellaneous minor matters. The statement is contradicted by the testimony of Joseph. He testified that Ella had not called on him for legal services for some time prior to Oct. 3, 1941. She also ▮▮▮ denied receiving this statement for legal services.

Thus it appears that if the deed under consideration is sustained, Grace would own the east sixty feet of Lot 402, and Joseph and Grace would own the west forty feet of said lot on which the residence is located. In this situation Ella would receive for the property only the above mentioned legal services of Joseph and his promise to render legal services to her free of charge during her life, and the promise

of a continuation of the friendly services (so-called) of Grace. It is not likely that Ella would be in need of future legal services of any consequence. Furthermore, Joseph and Grace testified that she was a nuisance. If so, she could only hope for friendly services from Joseph and Grace. It is not believable that Ella, after having given the east sixty feet to Grace, intended to give Joseph and Grace the west forty feet on which the residence is located. The property cost her $2500.00 and $300.00 for repairs. She would be left residing on Lot 403 as a neighborly nuisance and at the mercy of Joseph and Grace. Furthermore, it also is not believable that Ella would have given to Grace the east sixty feet of Lot 402, of the value of $500.00, on May 10, 1941, if Joseph had mailed to her the $200.00 statement for legal services Dec. 15, 1940. Furthermore, it also is not believable that she would have given to Grace said property if she had even suspicioned that Joseph would later make a claim for legal services. The lawyer experts testifying on the value of Joseph's services did not understand the facts of the case from the hypothetical question submitted to them.

Furthermore, Joseph was asked as a witness to explain the mailing of the account of Dec. 15, 1940, to Ella at 1483 E. 77th St. when she then resided at 2420 Linwood. He was unable to do so. He also was asked to explain how the three statements, which he claimed to have mailed to Ella on different dates, had on them an identical carbon mark which showed that the purported copies were made at the same time. He also was unable to explain this condition of the copies of the statements. On the next day and as a witness, he made the effort above mentioned to explain the strange occurrences.

Furthermore, although now claiming that Ella was indebted to him for legal services from September, 1940, to October 1, 1941, he continued to pay her the $20.00 a month rent until October 15, 1941. Furthermore, it is not believable that Ella and Grace agreed on $1900.00 for the property and at the same time, or about the same time, Ella agreed with Joseph to convey the property to Joseph and Grace in settlement of his legal services. Furthermore, the act of Joseph and Grace in tendering to Ella as a copy of the contract she signed a document containing the one hundred eighty day clause is not consistent with their contention that Ella executed a warranty deed conveying the property to them on October 3, 1941. The facts and circumstances in evidence corroborated the testimony of Ella on the controverted questions in the case.

The chancellor below did not believe the testimony of Joseph and Grace on controverted questions. However, Joseph and Grace direct attention to the testimony of the notary. She took the acknowledgment on Oct. 3, 1941. Eight months later she was called as a witness. In testifying, she located Ella at the corner of the desk with the deed at her elbow right side up and flat on the table. Joseph and Grace

testified that Ella was seated at the desk opposite to Joseph's desk chair, with the deed right side up and flat on the desk in front of her. The notary further testified that the deed was executed by Ella in the afternoon. Ella and Grace testified that the deed was excuted in the forenoon. Furthermore, after the intervening eight months she made an effort to testify in detail to every minor incident connected with the execution of the deed. The chancellor below also did not believe the testimony of the notary. We think Ella was induced to sign the deed by misrepresentation, manipulation and fraud. Even so, Joseph and Grace insist that they should be allowed payment for repairs on the property after the execution of the deed. The conveyance is the result of the deception of Joseph and Grace. It follows there is no equity in the claim for improvements. [Kisling v. Yoder, 236 S. W. 860, 867; Kadlowski v. Schwan, 329 Mo. 446, 44 S. W. 2d 639, 644.]

The judgment is affirmed. All concur.